UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Michael F. Dyer )
 )
    Plaintiff, )
 )
v. ) No. 15 CV 50265
 ) Magistrate Judge Iain D. Johnston
Nancy A. Berryhill, Acting )
Commissioner of Social Security,[1] )
 )
    Defendant. )

## MEMORANDUM OPINION AND ORDER

This is an action challenging the administrative law judge's ("ALJ") denial of social security disability benefits to plaintiff Michael F. Dyer. *See* 42 U.S.C. §405(g). Plaintiff alleges that back-related pain prevents him from working a full-time sedentary job.

### BACKGROUND

Plaintiff worked for many years in the maritime industry, where he loaded and unloaded barges and tugs, regularly lifting 75 to 150 pounds in shifts sometimes lasting 14 to 18 hours a day. R. 40. On November 20, 2009, he injured his back while lifting one of these heavy objects. R. 43. He was then 39 years old and had never had any back problems before.

After the injury, he tried physical therapy, but it did not work. Dkt. #14 at 2 (citing R. 344, 346-359). He had several MRIs and other tests. Then, on November 8, 2010, he had lumbar fusion surgery that resulted in four screws and two rods being inserted. R. 45. The surgery was performed because, as the ALJ later noted in the opinion, plaintiff's "lower back pain had not responded to conservative treatment." R. 18. After the surgery, plaintiff tried physical therapy

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

several more times. Over time, his pain improved somewhat, although how much it improved is the subject of dispute.

On May 5, 2011, plaintiff had a functional capacity evaluation administered by a company called ATI Physical Therapy.[2] R. 391. A month and a half later, one of plaintiff's doctors (Dr. Herman) wrote a letter releasing plaintiff to work a job consistent with the results of this evaluation.

On May 8, 2014, a hearing was held before the ALJ. In his opening statement, plaintiff's counsel referred to the proceeding as a "relatively straightforward case" involving back pain. R. 37-38 ("it's essentially a pain case"). Plaintiff then testified about his various limitations arising out of his back pain.

On July 11, 2014, the ALJ found that plaintiff, despite ongoing back pain, could perform a sedentary job with exceptions such as the freedom to stand or walk every two hours. The ALJ's reasoning is discussed below.

## DISCUSSION

Plaintiff argues that the ALJ committed two main errors: (1) the ALJ improperly "played doctor" in interpreting the objective medical evidence, and (2) the ALJ cherry-picked or misinterpreted the evidence to reach various conclusions. The Court agrees with these arguments, finding that there are too many unresolved questions, ambiguous statements, and inconsistent or incomplete explanations. In short, the ALJ did not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

---

[2] According to the ALJ, this test typically lasts about six hours and involves lifting, walking, balance, and other performance tests. R. 36. Also, based on commentary between the plaintiff's counsel and the ALJ at the start of the hearing, it appears that the functional capacity evaluation was being done for a worker's compensation claim, although plaintiff's attorney stated that plaintiff at the time of the hearing did not have any such case pending. R. 33.

Plaintiff focuses his arguments on the credibility analysis. The Court, therefore, will consider this analysis first and then will consider the ALJ's discussion of the medical opinions, some of which are also mentioned in the credibility analysis.

**I.        Credibility Analysis.**

To summarize a few key facts at the outset, the ALJ did not call a medical expert to testify at the hearing. In the opinion, the ALJ agreed that plaintiff had a severe impairment of degenerative disc disease and that this condition could cause the pain and limitations plaintiff allegedly was experiencing. Therefore, the key issue was whether plaintiff's allegations were believable. The ALJ concluded that they were not—specifically, they were "less than fully credible." R. 20. The ALJ's explanation was set forth in the following paragraph:

> After considering the claimant's allegations and complaints, the undersigned finds him to be less than fully credible. While the claimant elected to undergo lumbar fusion, the record indicates that he had no neurological deficits prior to the surgery (Exhibit 18F/25). While the physical consultative examiner noted that the claimant walked with an antalgic gait, that he could not heel/toe walk and that he had reduced 4/5 dorsal flexion of the right foot, the record also indicates that he has full strength and sensation of his upper and lower extremities (Exhibit 9F). While straight leg raising has been positive on occasion, the record indicates that the claimant has no accompanying motor weakness or neurological deficits. This is consistent with a finding that the claimant is able to perform work at the sedentary level. While the claimant testified that he has increasing levels of weakness of his hands, the record consistently indicates that he has full grip and dexterity bilaterally. After undergoing a functional capacity evaluation, the claimant was released to work at the light exertional level (Exhibit 7F). In addition, Vijay Marwaha, M.D., the claimant's treating physician, opined that the claimant is able to perform sedentary work (Exhibit 12F). Therefore, the undersigned finds that the opinions of the claimant's treating physicians do not support a finding of disability. Even though the undersigned has limited the claimant to sedentary work, the vocational expert testified that there are jobs in the economy that the claimant can perform. The record indicates that the claimant's symptoms improved after participating in physical therapy, which suggests that they can be managed through the use of conservative treatment.

R. 20-21.

The credibility analysis in this paragraph is insufficient for several reasons.[3] First, the paragraph is vague without any deeper explanation of why the particular facts being proffered lead to the implied conclusions. To cite a general example, the paragraph contains a series of "while" sentences, in which the first half of the sentence (the "while" clause) lists medical findings seemingly supporting plaintiff's position, but then the second half of the sentence sets forth contrary facts supporting the ALJ's position. The ALJ seems to have been utilizing some sort of weighing process, but it is not clear what this process was or why certain facts were deemed more probative than others.

Consider, as a specific example, the second sentence, which states as follows: "While the claimant elected to undergo lumbar fusion, the record indicates that he had no neurological deficits prior to the surgery (Exhibit 18F/25)." This sentence is hard to decipher. The first half mentions a fact ostensibly supporting plaintiff's position (namely, that his condition was serious enough to warrant surgery), but this point is then undercut by the reference to plaintiff having "elected" to undergo this surgery and by the observation that plaintiff had no neurological deficits "prior to" that surgery. The overall impression from this sentence (to this Court, at least) is that plaintiff needlessly underwent an invasive surgery. If this is the intended message, then it is an odd one. Not only does it cast aspersions on plaintiff's doctor who was willing to perform such a surgery, but it is inconsistent with the ALJ's larger narrative that plaintiff, in fact, had an objectively-demonstrated back condition that *improved* as a result of the surgery. In short, the Court is baffled as to what larger point the ALJ was trying to convey by this sentence. Therefore,

---

[3] An ALJ's credibility determination should be reversed only if it is patently wrong. *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). However, an ALJ's decision may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.*; *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning").

this sentence does not "adequately explain" why it supports the credibility finding. *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015).

Second, and related to the first point, the ALJ was "playing doctor" in this paragraph. *See Lewis v. Colvin*, No. 14 CV 50195, 2016 U.S. Dist. LEXIS 115969, *11 n. 3 (N.D. Ill. Aug. 30, 2016) (courts, counsel, and ALJs must resist the temptation to play doctor). The ALJ pointed out that plaintiff had no neurological deficits (mentioned twice in the paragraph), no motor weakness, full strength and sensation in his extremities, full grip, and bilateral dexterity. The underlying premise is that a person with these particular findings would likely not have disabling back pain. However, this conclusion, which is the foundational assumption in this paragraph, as well as the ALJ's opinion as a whole, is based only on the ALJ's own layperson intuitions. As plaintiff asserts, "[n]o medical professional has opined or even suggested that [plaintiff's] allegations would only be credible if accompanied by" these specific findings identified by the ALJ. Dkt. #14 at 7. Perhaps the ALJ is correct in her belief that a person with work-disabling back pain would necessarily have neurological deficits (among other things), but these conclusions are not justified based on the current record. For this reason, on remand, the ALJ must call a medical expert. HALLEX I-2-5-34.A.1.

As an additional illustration of these problems, consider the last sentence of the paragraph, which states as follows: "The record indicates that the claimant's symptoms improved after participating in physical therapy, which suggests that they can be managed through the use of conservative treatment." This sentence addresses an appropriate consideration—nature of the treatment—but does so in conclusory and selective fashion. As for the treatments tried by plaintiff, the Court notes that the record (including the ALJ's own summary of that record) refers to several instances in which plaintiff tried conservative

5

treatments. In 2010, plaintiff tried certain unspecified "conservative" treatments that the ALJ stated were unsuccessful. R. 18. These attempts were before the surgery, but after surgery, plaintiff attended 27 physical therapy sessions in early 2011. This therapy did not lead to a noticeable improvement, although this point needs to be addressed directly on remand. So this round of therapy is not likely the one being referred to in the above sentence. Instead, the ALJ likely is referring to a later round of physical therapy, starting in the latter part of 2012. This interpretation fits with an earlier statement the ALJ made in the narrative portion of the opinion. There, she stated the following about this round of therapy:

> The claimant was discharged from physical therapy in January of 2013 after attending 12 sessions (Exhibit 11F/19). At his last session, the claimant reported that his pain had decreased from a 7 to 3-4/10, that he had decreased numbness of the left lower extremity but still had occasional symptoms in his right lower extremity and that his range of motion had increased (Exhibit 11F/18).

R. 19. This description portrays plaintiff as gradually improving over the course of these 12 sessions. But this story rests on a selective and incomplete review of the evidence. Although the ALJ indicated that plaintiff's *last* therapy session was in January 2013, the records relied on by the ALJ indicate that he had at least one more session, on March 18, 2013, at which point he rated his pain as 4/5—in other words, *higher* than in the supposed last session. R. 539. Thus, it is not true that plaintiff's pain was at its lowest in the last session; instead his pain seems to be fluctuating around a common range, although this point needs further examination before any firm conclusion can be reached. These factual discrepancies in the credibility analysis are another reason favoring remand. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on "errors of fact or logic"). In any event, plaintiff has never denied that he had *some* improvement after physical therapy. So this is not a case where the claimant's credibility is doubted because he made inconsistent statements to different

6

people about the level of his pain. There is no allegation that plaintiff was untruthful or inconsistent in how he described his pain. So the relevant question is whether, even with some improvement, he was still in too much pain to engage in the prolonged sitting needed to work a sedentary job. The ALJ did not squarely address this question. In addition to these problems, the ALJ's argument in this sentence rests on an implied medical judgment—namely, that plaintiff's back pain "can be managed through the use of conservative treatment" consisting of continued physical therapy sessions. But this conclusion was not made by any doctor insofar as this Court can tell. This is another issue for the expert to address on remand.

## II. Medical Opinions.

In the credibility analysis, but also in other parts of the opinion, the ALJ evaluated the medical opinions. The ALJ did not agree with all of these opinions and, in fact, rejected some of them (such as the Agency doctors) giving them only "little weight" or, ambiguously, stating that others were given weight only "to the extent that" they were in line with the ALJ's own RFC formulation. In other words, when the ALJ agreed with the opinion, the opinion was consistent, but if the ALJ disagreed with the opinion, the ALJ simply disregarded it. Still, on balance, the ALJ suggested in various ways that several doctors agreed that plaintiff was not disabled. In its response brief, the Government puts the point more strongly, stating that the "ALJ observed that the *reliable medical opinions* did not support Mr. Dyer's allegations of subjectively disabling symptoms." Dkt. #21 at 5 (emphasis added). However, as explained below, the ALJ took an overly aggressive approach in interpreting these opinions.[4]

---

[4] A separate but important problem is that the ALJ did not follow the treating physician rule and specifically did not apply the checklist of factors included in this rule. *See* 20 C.F.R. § 404.1527. However, the plaintiff did not raise this argument. Still, on remand, the ALJ should explicitly follow this rule. Doing so may help avoid the uncertainty the Court finds in the current opinion.

**Dr. Herman and The Functional Capacity Evaluation.** In the credibility paragraph, the ALJ stated the following: "After undergoing a functional capacity evaluation, the claimant was released to work at the light exertional level (Exhibit 7F)." R. 21. Although not named explicitly, Dr. Herman is the person who "released" plaintiff to work in a letter dated June 28, 2011. The functional capacity evaluation ("FCE") was a day-long assessment performed on May 5, 2011, and was done by a "certified assessment specialist."[5] R. 391. In the cover letter to the report, the specialist summarized the findings as follows:

> Mr. Dyer demonstrated his functional capabilities at the LIGHT Physical Demand Level during the assessment. This means he is occasionally capable of lifting 32 lbs.[ ]
>
> The client has participated in Physical Therapy to date and Work Conditioning to date. He states he did not tolerate Work Conditioning very well. During the Assessment the client reported increased pain in the low back with many of the lifting activities. He also demonstrated difficulties with bending/stooping, crawling, climbing stairs, kneeling, balancing and left foot repetitive movement. Again, please review the following pages for specifics. It is recommended [that] the MD address the [client's] pain reports all [sic] appropriate treatment options upon the client's next MD apt.

R. 391. The ALJ interpreted these comments to mean that the specialist believed plaintiff could work a full-time job. In addition, the ALJ also suggested (without explicitly stating so) that Dr. Herman agreed with these conclusions. In its response brief, the Government puts the argument in more explicit terms, interpreting the ALJ's statement to mean that Dr. Herman "expressly adopted" the FCE's conclusions. Dkt. #21 at 5.

To evaluate these assertions, it is important to consider the underlying source document. In his June 28, 2011 letter, Dr. Herman stated, in pertinent part, the following about the FCE:

> Mr. Dyer returned to see me for follow-up. His low back pain improved over three weeks after his functional capacity evaluation, *which had aggravated it*. He still gets stiffness when he sits for [a] long period of time such as the drive to my office,

---
[5] This person does not appear to be a doctor.

> *which is roughly one hour*. Lidoderm patches help. He has normal strength and sensation and good range of motion on his neurological exam.
>
> It is my impression that he is clinically currently at maximum medical improvement. *He will have permanent work restrictions consistent with his functional capacity evaluation*.

R. 465 (emphasis added). As suggested by the italicized portions, this letter contains several statements undermining the ALJ's and the Government's interpretations. First, as Dr. Herman noted, the effort plaintiff exerted during the FCE aggravated his back pain, which then took over three weeks to return to the pre-FCE level.[6] This raises a question: if plaintiff were to work full-time, would this daily effort also aggravate his back pain leading to missed days of work? This question was not considered, but should be on remand. Second, Dr. Herman noted that plaintiff's back problems emerged after *one hour* of sitting. However, the ALJ concluded that plaintiff could sit for two hours at a time. This apparent discrepancy also should be considered. If necessary, the ALJ should re-contact Dr. Herman for clarification.

**Dr. Marwaha.** The ALJ stated the following: "Vijay Marwaha, M.D., the claimant's treating physician, opined that claimant is able to perform sedentary work (Exhibit 12F)." R. 21. The ALJ again has taken equivocal statements and amplified them into a bolder statement than warranted by the source materials. The ALJ cited to Exhibit 12F, a 9-page questionnaire completed by Dr. Marwaha. However, after carefully reading this document several times, the Court can find no explicit statement where Dr. Marwaha "opined that" plaintiff could work a sedentary job. That conclusion is the ALJ's own interpretation as to what Dr. Marwaha's specific findings mean. The finding on this questionnaire that best fits the ALJ's theory is Dr. Marwaha's answer to the question about how long plaintiff can "sit or stand *at a stretch*," which he answered

---

[6] Also, as the FCE specialist noted, plaintiff also reported experiencing pain *during* the assessment. *See* R. 375, R. 378.

was two hours. R. 558 (emphasis added). This arguably supports the ALJ's two-hour sitting limitation, but this answer is vague about whether Dr. Marwaha believed that plaintiff could sit in a series of two-hour increments over a full eight-hour day. Also, although not acknowledged by the ALJ, Dr. Marwaha gave other answers on this same form that undermine the ALJ's findings, including that plaintiff experienced pain, numbness, loss of sensation, tenderness, and nerve root compression. R. 557. If the ALJ intends to rely on this document on remand, she should re-contact Dr. Marwaha and seek clarification.

**Dr. Osafo.** Dr. Seth Osafo was a consultative examiner. The ALJ stated the following about Dr. Osafo's findings:

> Dr. Osafo opined that the claimant is able to sit, stand, walk, carry and handle objects and hear and speak without limitations (Exhibit 13F/11). The undersigned gives these opinions weight to the extent that they are consistent with the residual functional capacity, as the record indicates that he has displayed tenderness of his lower spine and has walked with a slight limp during examinations conducted by his treating physician.

R. 20. As an initial matter, there is a wrinkle here in that the ALJ did not accept this opinion—that plaintiff is able to sit and do other activities "without limitation"—in full. Instead, the ALJ accepted it only "to the extent that [it was] consistent with" the ALJ's own RFC. In other words, the ALJ disagreed in part with Dr. Osafo's opinion. The ALJ used this "to the extent that" language in connection with several other opinions. It is not only vague but it gives the impression that the ALJ followed a Procrustean bed approach, first deciding on an RFC and then paring down the medical opinions so that they would fit the predetermined structure.

In any event, the Government ignores this wrinkle and argues more straightforwardly that Dr. Osafo's opinion is simply yet another piece of evidence supporting the ALJ's conclusion. Dkt. #21 at 5. However, like the other medical opinions, Dr. Osafo's opinion is not nearly as clear-cut as the ALJ and the Government suggest. It is true that Dr. Osafo's office notes dated

May 21, 2013 contain a single sentence along the lines quoted by the ALJ (*i.e.* that plaintiff could sit and do the other activities "without limitations"). R. 576. But this sentence on its face is ambiguous as to how long and how often plaintiff could do these various tasks. In addition, other statements in these very same notes raise a question as to whether Dr. Osafo truly believed that plaintiff could do these activities on a consistent basis in a full-time job. For example, in the patient history section, Dr. Osafo stated that plaintiff's description of his pain and various limitations was "reliable." R. 573. This is a statement by a treating doctor directly stating that plaintiff was credible; yet the ALJ never acknowledged this evidence in finding that plaintiff was *not* credible. Moreover, in summarizing plaintiff's history, Dr. Osafo noted that plaintiff had reported that the "pain in his lower back is *aggravated by prolonged* walking, sitting, standing, bending and lifting with pain radiating to his right leg" and that he "is unable to work due to constant daily pain to his lower back and inability to stand, sit or stand of any length of time without his lower back hurting." R. 573. Again, Dr. Osafo stated that this history was reliable. The ALJ should have acknowledged this contrary evidence or alternatively have re-contacted Dr. Osafo to resolve these apparent discrepancies.

In addition to the above arguments, which justify a remand, the Court notes that it encountered anomalies throughout the ALJ's opinion. Although most of them did not involve major issues, they were nonetheless nagging inconsistencies that raised doubts about the ALJ's overall approach. Two examples will be noted.

First, plaintiff alleged that he suffered from a bereavement disorder arising from the death of his teenage son. Although this was not plaintiff's chief complaint, the ALJ addressed this allegation in several places. The first was in considering whether the bereavement disorder could qualify as a severe impairment. There, the ALJ concluded that it did not because plaintiff "did

not actually seek treatment for this condition (Exhibit 18F)."[7] R. 15. However, at the end of the opinion, the ALJ indicated that she was including a limitation in the RFC to account for plaintiff's bereavement disorder. *See* R. 22 ("the claimant is limited to simple, routine and repetitive work due to bereavement syndrome and to the side effects related to his medications"). This statement seems inconsistent with the earlier statement, although perhaps they are reconcilable, and there is no acknowledgement or explanation for the apparent discrepancy. In short, the ALJ inserted this bereavement limitation out of thin air.

Second, similar concerns about consistency arise regarding the ALJ's analysis of plaintiff's medications. As stated in the sentence quoted above, the ALJ believed that side effects from plaintiff's medications were another reason to limit him to simple and routine work. This statement, which is not accompanied by any explanation, assumes that plaintiff was legitimately experiencing medication side effects hindering his ability to concentrate. However, earlier in the opinion, the ALJ made statements suggesting that plaintiff's condition was not serious because, for example, he was "only taking ibuprofen for his symptoms."[8] R. 18. But if plaintiff was only taking ibuprofen, then why did the ALJ include a limitation for medication side effects? In addition, this argument does not acknowledge that plaintiff repeatedly stated that he used Lidoderm patches, and perhaps other medications. *See* R. 465 (6/28/11: "Lidoderm patches help."); R. 499 (10/27/12: listing medications as "Lidoderm Patch, Naproxen, Methocarbamol, Tramadol"). Finally, as an additional consideration, plaintiff has alleged that he "only can afford Lidoderm patches for pain" and that he "took stronger medications in the past, but they made him nauseated and mentally fuzzy." Dkt. #14 at 5; R. 48 (testifying that he took narcotics but

---

[7] As an aside, the ALJ's characterization that plaintiff sought *no* treatment is disputable because there is evidence that plaintiff attended two therapy sessions. *See* R. 605 ("After the patient's son died, he saw a psychiatrist in Yorkville for consultation regarding symptoms of bereavement. [ ] The patient saw the psychiatrist for 2 psychotherapy sessions.").
[8] The Government emphasizes this fact in its brief. *See* Dkt. #21 at 6.

12

stopped because they made him "fuzzy all the time"). To the extent that the ALJ concludes on remand that plaintiff was not taking medications commensurate with his alleged pain, then the ALJ must consider this testimony before drawing any adverse inferences. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine.").

Having concluded that a remand is warranted, the Court need not address plaintiff's argument that the ALJ failed to consider whether plaintiff met a closed period of disability from November 2009 through June 2011. This argument, and any other arguments not addressed herein, can be raised on remand. In light of all the unresolved medical issues discussed herein, the ALJ must call a medical expert on remand. HALLEX I-2-5-34.A.1.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: February 21, 2017    By: _____
　　　　　　　　　　　　　　　　Iain D. Johnston
　　　　　　　　　　　　　　　　United States Magistrate Judge